UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**TERRANCE G. SIMMONS**,                    Case No. 1:10 CV 1600

    Plaintiff,                    Judge Sara Lioi

    v.                    REPORT AND RECOMMENDATION

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.                    Magistrate Judge James R. Knepp II


### Introduction

Plaintiff Terrance Simmons seeks judicial review of Defendant Commissioner of Social Security's decision to deny disability insurance benefits (DIB) and supplemental security income (SSI). The district court has jurisdiction under 42 U.S.C. § 405(g) and § 1383(c)(3).

This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b)(1). For the reasons below, the undersigned recommends the Commissioner's decision be reversed and remanded for proper determination of Plaintiff's disability onset date.


### Procedural Background

Plaintiff filed an application for SSI and DIB on July 29, 2004, alleging disability as of February 10, 2003. (Tr. 81-88). Plaintiff met the insured status requirement for DIB through June 30, 2005. (Tr. 25); *see* 20 C.F.R. § 404.130. Plaintiff's claim was denied initially and on reconsideration. (Tr. 64-66, 70-73). Plaintiff thereafter sought a hearing. (Tr. 63). An ALJ held a hearing on December 10, 2007, at which Plaintiff appeared with his attorney and testified. (Tr. 285-304). Lynn Smith, a vocational expert (VE), also testified at the hearing.

In a written decision dated January 31, 2008, the ALJ found Plaintiff disabled as of February 1, 2006, but not disabled prior to that date. (Tr. 18-37). The ALJ found Plaintiff had severe impairments of "bilateral plantar fasciitis[,] degenerative arthritis and facet hypertrophy of the lumbar spine, degenerative arthritis of the right hand, right foot, and right shoulder acromioclavicular joint, and depression with chronic pain." (Tr. 25). The ALJ found before February 1, 2006, Plaintiff had the residual functional capacity (RFC) to do a range of light work, specifically:

> he could lift, carry, push, and pull 10 pounds frequently and 20 pounds occasionally and could sit, stand and/or walk for 6 hours each during the course of an 8-hour workday, with normal breaks.  He was further limited to simple, routine and low stress tasks requiring only limited and superficial interaction with supervisors, coworkers and the public.  He was precluded from tasks that had strict time requirements and high production quotas, which would exclude, for example, fast-moving assembly lines or working at piecework payment rates.

(Tr. 30).  After February 1, 2006, Plaintiff had an RFC for sedentary work, specifically:

> he can lift, carry, push and pull a maximum of 10 pounds, can sit for 6 hours, and can stand and/or walk for 2 hours during an 8-hour workday.  He has the same nonexertional limitations and previously indicated[.]

(Tr. 31).  The ALJ found, based on the testimony of the VE, prior to February 1, 2006, there were a significant number of jobs in the national economy Plaintiff could perform, but after February 1, 2006, the Medical-Vocational Rules dictated Plaintiff was disabled.  (Tr. 32-33).

The ALJ's decision became the final decision of the Commissioner following the Appeals Council's denial of review on May 17, 2010 (Tr. 5-7).  *See* 20 C.F.R. §§ 404.981, 416.1481. Plaintiff then filed the instant case seeking judicial review of the ALJ's decision on July 21, 2010. (Doc. 1).

2

## Factual Background

*Physical Health*

In August 2004, Plaintiff underwent a consultative physical examination by Dr. Mehdi Saghafi at the request of the state agency.  (Tr. 151-57).  Plaintiff reported constant pain in his right hip aggravated by standing and walking, and pain in both knees and his left heel when walking.  (Tr. 151).  He reported first noticing pain in 1993, but had not visited a doctor.  (*Id.*).  He was taking Celebrex and Tylenol.  (*Id.*).  On examination, Dr. Saghafi noted Plaintiff had a stable gait and walked with a cane.  (*Id.*).  Plaintiff had some leg raising limitations due to his hip pain (*id.*), mostly normal ranges of motion and muscle strength, and some decreased left hand dynamometer readings.  (Tr. 151-56).  An x-ray showed no fracture or dislocation of Plaintiff's hip.  (Tr. 157).  Dr. Saghafi diagnosed a residual strain of both hips, and opined Plaintiff could: sit, stand, and walk eight hours per day; did not need an ambulatory aid; lift and carry 20 pounds frequently and 50 pounds occasionally; push, pull, and manipulate objects; operate hand and foot controls; drive a motor vehicle; travel; and climb stairs. (Tr. 152).

In December 2004, Plaintiff went to the emergency room complaining of foot, hand, and hip pain for four months.  (Tr. 179).  Plaintiff had a steady gait, with no grimacing.  (Tr. 179).  Dr. Julie Brumer found Plaintiff had full range of motion, no swelling, but pain with internal hip rotation and point tenderness in both knees anteriorly.  (Tr. 177).  He was prescribed Motrin.  (*Id.*).

In January 2005, Plaintiff returned to establish care.  He reported chronic  knee, hip, back, and wrist pain and he had been taking Tylenol for pain relief.  (Tr. 162, 168).  He reported numbness or tingling in his hands.  (Tr. 163).  Examination notes indicate Plaintiff had limited range of motion in his spine in flexion, and a normal gait. (Tr. 164, 170).  He was given medication for high blood

pressure and referred to pain management and rehabilitation for his joint pains.  (*Id.*).  At a follow

up visit in February 2005, Plaintiff reported improved blood pressure and that he had missed his pain

management appointment because he was sick.  (Tr. 159).

     In February 2006, Plaintiff saw Dr. Michael Schaefer in physical medicine and rehabilitation.

(Tr. 263-64).  He reported diffuse joint pains since 2003 and severe, sharp bilateral heel pain when

walking.  (Tr. 263).  He also reported right wrist pain at the base of his thumb, and right hip and

buttock pain better with rest.  (*Id.*).  On examination, Dr. Schaefer noted moderately reduced spine

range of motion, tenderness, and an antalgic gait.  (Tr. 263-64).  Plaintiff had tenderness "at plantar

fascia origin".  (Tr. 264).  Dr. Schaefer recommended exercises for Plaintiff's plantar fasciitis and

low back, and discussed a physical therapy referral or injections in the future.  (*Id.*).

     Plaintiff saw Dr. Schaefer again in June 2006.  (Tr. 258-60).  He reported continued severe,

sharp bilateral heel pain with walking despite arch supports.  (Tr. 259).  Plaintiff also reported neck

pain.  (*Id.*). Dr. Schaefer noted similar findings on examination, gave Plaintiff injections for plantar

fasciitis, and prescribed medication.  (Tr. 260).

     Right hand x-rays showed generalized osteoarthritic changes (Tr. 271) and bilateral foot x-

rays showed moderate sized plantar enthesophytes with mild to moderate joint space narrowing and

subchondral sclerosis at the first metatarsophalangeal joint compatible with mild osteoarthritis (Tr.

269-70).  Lumbar x-rays showed mild multilevel degenerative disc disease (Tr. 268) and right

shoulder x-rays showed degenerative AC joint osteophytosis (Tr. 265-66).  Knee x-rays were

normal.  (Tr. 266-67).

     In August 2006, Dr. Schaefer completed a functional capacity assessment.  (Tr. 207-08).  Dr.

Schaefer opined Plaintiff had severe plantar fasciitis, chronic, cervical radiculitis, mechanical

chronic low back pain, hip pain, and left elbow neuritis.  (Tr. 207).  He noted Plaintiff has had these problems since 2003.  (Tr. 207).  He opined Plaintiff was unemployable for twelve months or more, finding many work functions extremely limited.  (Tr. 208).

Plaintiff continued to see Dr. Schaefer in 2006 and 2007.  (Tr. 232-34, 236-50).  In November 2006, Dr. Schaefer noted Plaintiff described a history of "diffuse[] joint pains since 2003" and "[i]n particular, plantar fasciitis has been very severe and disabling since springtime of 2004." (Tr. 232).  On examination, Dr. Schaefer found Plaintiff's lumbar spine had a moderately reduced range of motion in all directions, he had an antalgic gait, and his shoulders had a mildly reduced range of motion.  (Tr. 233).

On December 14, 2006, Dr. Schaefer filled out a document entitled "Arthritis Residual Functional Capacity Questionnaire" which had pre-printed at the top: "Condition Prior to June 2005 and Continuing".  (Tr. 226).  He noted diagnoses of severe plantar fasciitis and multiple joint pains. His prognosis was "[p]oor but stable".  (*Id.*).  He opined Plaintiff's pain was "[s]eldom" severe enough to interfere with attention and concentration.  (*Id.*).  He stated Plaintiff could continuously sit or stand for twenty minutes at a time, and could walk two city blocks.  (Tr. 227).  Plaintiff would need four to five unscheduled breaks per day.  (*Id.*).  Plaintiff could frequently lift less than ten pounds, and occasionally lift ten pounds.  (Tr. 228).  He could not stoop or crouch, and would be absent about once a month.  (*Id.*). Dr. Schaefer also completed a pain questionnaire where he listed Plaintiff's impairments as severe plantar fasciitis, lumbar spondylosis, bilateral knee pain, neck pain – cervical radiculitis, and shoulder degenerative joint disease.  (Tr. 229).  He noted these findings were confirmed by objective and clinical findings such as x-rays, limited range of motion, tenderness, response to plantar fascia injections, and "willingness to repeat injection despite very

5

painful procedure."  (Tr. 229).  He noted "such diffuse joint involvement" would make it "hard to find any comfortable position."  (*Id.*).

In June 2007, Plaintiff went to the emergency room with left knee pain.  (Tr. 247-48).  He followed up with Dr. Schaefer (Tr. 242-44), who noted near full range of motion of the knee with pain at end range flexion, trace effusion, and that he was tender over the PF joint line.  (Tr. 244).  Dr. Schaefer assessed probable patellofemoral or early degenerative joint disease flare and recommended a knee brace and exercises.  (*Id.*).

*Mental Health*

Sally Felker, Ph. D, performed a consultative psychological examination at the request of the state agency on June 9, 2005.  (Tr. 180-83).  Plaintiff reported symptoms of depression and problems with sleep due to chronic pain.  (Tr. 180-81).  He reported the pain made it difficult for him to concentrate and focus.  (Tr. 181).  Dr. Felker said Plaintiff "was cooperative, did not reveal problems with impulse control, but described his level of motivation as poor."  (*Id.*). Plaintiff reported avoiding social situations because of irritability, and he "worries about many things, thus preventing himself from going to sleep." (*Id.*). Dr. Felker noted Plaintiff could not do serial seven subtractions, his recall for digits was below normal, and he was "very slow to respond." (Tr. 182). Plaintiff described his daily activities as including light housework, preparing meals when necessary, watching television, sitting on the porch, attending church occasionally, and reading the newspaper occasionally.  (*Id.*). Dr. Felker diagnosed chronic pain disorder associated with psychological factors and a medical condition, with some depressive symptoms.  (*Id.*). She assigned Plaintiff a Global

Assessment of Functioning (GAF) score of 52.[1]  Dr. Felker noted Plaintiff "shows mild to possibly moderate restriction in his ability to concentrate for sustained activities" and his "[a]bility to understand and follow instruction is not impaired, however, capacity for carrying out tasks is limited due to chronic pain disorder."  (*Id.*).  His "[a]bility to relate to others and to deal with the general public is mildly to moderately impaired" and his "[a]bility to work [with] peers and supervisors and to tolerate the stresses associated with employment is moderately to seriously impaired due to chronic pain and depressive symptoms."  (*Id.*).

On June 23, 2005, state agency reviewing consultant Kevin Goeke completed a mental residual functional capacity assessment.  (Tr. 184-90).  He concluded Plaintiff had the ability to perform simple work-related tasks, make simple work-related decisions, follow directions, and concentrate adequately for simple tasks. (Tr. 186).  His irritability would limit frequent contact with the public or coworkers, and "[h]e would perform best in a low stress work environment [without] strict time or production pressures."  (*Id.*).

On May 5, 2005, Plaintiff went to the Murtis H. Taylor Multi-Service Center (Murtis Taylor). (Tr. 200).  He reported a depressed mood, reduced energy and sleep, and reduced interest and attention.  He was noted to meet the criteria for major depression with chronic pain, and was prescribed Cymbalta.  (*Id.*). At a follow up visit in June 2005, Plaintiff reported medication helped his depressive symptoms.  (Tr. 199).  In July 2005, Plaintiff reported his sleep had improved, but

---

[1] A GAF score of 51-60 "indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning e.g., few friends, conflicts with peers or co-workers)." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 503 (6th Cir. 2006) (citing Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders (4th Ed., Text Rev. 2000)).

reported occasional hallucinations.  (Tr. 198).  In August 2005, Plaintiff reported low energy and activity and memory loss.  (Tr. 197).

In August 2005, Murtis Taylor Nurse Jane Root performed a psychiatric evaluation of Plaintiff.  (Tr. 192-96).  Plaintiff reported for the past three years he had problems sleeping, memory loss, no energy, and was irritable and forgetful.  (Tr. 192).  He lived with his sister and had friends and a girlfriend.  (Tr. 193).  Root noted Plaintiff "describes self as depressed" but "doesn't seem anxious".  (Tr. 194).  She reported Plaintiff could not do serial threes and performed calculations poorly.  (*Id.*). Root stated Plaintiff had "depression r/o dementia" and suggested he see a neurologist for cognitive symptoms.  (Tr. 195).  She concluded Plaintiff is unemployable and his mental limitations were likely to last for twelve months or more.  (Tr. 202).

In November 2005, Plaintiff saw Dr. Olufunke Fajobi for a mental health assessment.  (Tr. 219).  He complained of memory loss and depression and reported difficulty with math, forgetting names, and forgetting a child's birthday.  (*Id.*).  On examination, Plaintiff was "somewhat withdrawn", had a depressed mood and blunted affect, logical thought process, fair judgment and insight, poor recent memory and good remote memory.  (Tr. 221).  Plaintiff could not do serial sevens but could do serial threes.  (*Id.*).  Dr. Fabjobi diagnosed depression due to general medical condition versus major depressive disorder, single episode.  (Tr. 222).  Dr. Fabjobi assigned Plaintiff a GAF of 41-50,[2] and prescribed Effexor.  (*Id.*).

---

[2] A GAF score 41-50 "indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Kornecky*, 167 F. App'x at 503 (citing Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders (4th Ed., Text Rev. 2000)).

In January 2006, Plaintiff reported no improvement in symptoms.  (Tr. 217).  Dr. Fajobi diagnosed depression secondary to a general medical condition and changed Plaintiff's medication to Wellbutrin.  (*Id.*).

Plaintiff returned to Dr. Fajobi in July 2006 after missing multiple follow-up visits.  (Tr. 214).  He reported interrupted sleep, depressive symptoms, and no energy.  (*Id.*). Dr. Fajobi re-started Plaintiff on Wellbutrin (giving him samples), which he had stopped taking because he could not afford it.  (Tr. 214-15).

In August 2006, Plaintiff reported being off medication for two weeks due to finances. (Tr. 213).  He continued to report interrupted sleep and depressive symptoms.  (*Id.*). Dr. Fajobi gave Plaintiff a coupon for medications, and filled out a form for medication assistance from the county. Dr. Fajobi noted "some distress with ambulating".  (*Id.*). Dr. Fajobi completed a mental functional capacity assessment in which he opined Plaintiff was markedly or extremely limited in many areas. (Tr. 205-06).  He opined Plaintiff was unemployable and his functional limitations were expected to last for twelve months or more.  (*Id.*).

In October 2006, Plaintiff reported sad mood, social isolation, and loss of interest in daily activities, but increased energy.  (Tr. 211).  Dr. Fajobi noted: "Memory remains poor as per patient. However, not loosing [sic] things, doing better with keeping appointments." (Tr. 211).  In December 2006, he noted Plaintiff was socializing more, but had difficulty with motivation. (Tr. 254)).

In February 2007, Dr. Fajobi noted Plaintiff had depressed mood, change in weight, change in sleep, psychomotor retardation, and poor concentration.  (Tr. 251).  He reported an improved mood, but continued difficulties with memory.  (Tr. 253). In June, Dr. Fajobi noted Plaintiff had been off medication for a month and a half due to inability to afford it.  (Tr. 240).  Dr. Fajobi gave

him samples, and noted Plaintiff reported irritability and insomnia. (*Id.*). In October, Dr. Fajobi noted improvement in insomnia and irritability. (Tr. 278). Throughout this time period, Dr. Fajobi monitored and adjusted Plaintiff's medications. Also at each visit, in the "Objective/Mental Status Exam" section of his notes, under "Attention/Concentration" and "Recent and Remote Memory", Dr. Fajobi noted: "[C]lient reports difficulty". (Tr. 211, 213, 215, 218, 240, 253, 254, 278).

In November 2007, Dr. Fajobi completed a form entitled: "Assessment of Ability to do Work Related Activities (Mental); 'Condition Prior to June 2005 and Continuing'". (Tr. 274-75). He concluded Plaintiff had numerous marked and extreme limitations (*Id.*). Under "Duration of Impairment" Dr. Fajobi explained: "[Plaintiff] reports symptoms started in 1999." (Tr. 275). He concluded Plaintiff's impairment was likely to deteriorate if placed under stress, such as at a job, and that Plaintiff would be absent from work more than three times a month. (*Id.*).

*Hearing Testimony*

Plaintiff testified Dr. Fajobi diagnosed him with depression and memory loss and that he takes Wellbutrin and a sleeping pill. (Tr. 290-91). Plaintiff said he is impatient and irritable because he is in pain constantly. (Tr. 291-92). His daughter helps him grocery shop but he does not do anything with friends or leave his house often. (Tr. 292). Plaintiff testified he has pain in his feet, knees, hip, back, fingers, elbow, shoulders, and spine, for which he takes Celebrex, ibuprofen, and Aleve. (Tr. 293). He said the medications help somewhat, "[a]nd sometimes they don't." (*Id.*). He gets injections in his feet to treat the plantar fasciitis which feels like "walking on pins" and the "[b]ack of the heels hurt real bad." (Tr. 294). He said he uses a cane, even around the house. (Tr. 295). Because of his hand pain, Plaintiff cannot shave without cutting himself, and he cannot write well. (Tr. 296). Plaintiff testified he cannot stand for more than fifteen minutes because his feet hurt

10

and he has intense pain.  (*Id.*).  He tries not to lift anything, and uses both hands when drinking

coffee so as not to drop the cup.  (*Id.*).

VE Lynn Smith testified about the exertional requirements of Plaintiff's previous work as

a laborer and mattress taper.  (Tr. 298).  The ALJ asked the VE to assume a

> hypothetical worker . . . 52 years old . . . high school graduate.  No relevant
> vocational training.  Exertionally this hypothetical worker can do a range of light
> work.  By which I mean, that the hypothetical worker can sit, stand or walk for six
> hours each day during an eight hour day.  Lift, carry, push or pull 10 pounds
> frequently, and 20 pounds occasionally. . . . . And the hypothetical worker is further
> limited to simple routine, low stress tasks where there is only superficial interaction
> with supervisors, coworkers, and the public.  And while – where there are no strict
> time requirements ad no high production quotas. By high production quotas, I mean
> to exclude those sorts of jobs where there is a fast moving assembly line, or it's
> necessary to work very quickly at piece rate to make any money.  By strict time
> requirements I'm thinking of the kind of office environment I'm used to, where the
> number ad time of breaks is, is the same for everybody.  But if you take your break
> a few minutes before the hour, instead of on the hour, or a few minutes after, that's
> usually ok.

(Tr. 299-300).  The VE replied that such an individual could perform jobs in the national economy

such as laundry worker, ticket seller, and mail clerk.  (Tr. 301).  When Plaintiff's attorney gave a

more restrictive hypothetical consistent with Dr. Fajobi and Dr. Schaefer's restrictions, the VE

testified there would be no jobs.  (Tr. 301-03).

### Standard of Review

In reviewing the denial of Social Security benefits, the Court "must affirm the

Commissioner's conclusions absent a determination that the Commissioner has failed to apply the

correct legal standards or has made findings of fact unsupported by substantial evidence in the

record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence

is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as

a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health &*

11

*Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact

if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474

F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a

preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as

substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc.

Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### Standard for Disability

Eligibility for SSI and DIB is predicated on the existence of a disability. 42 U.S.C. § 1382(a).

"Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12 months." 20

C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step

evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is

disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy.  *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## Discussion

Plaintiff raises two issues: 1) the ALJ violated the treating physician rule; and 2) the ALJ violated Social Security Ruling (SSR) 83-20 in determining Plaintiff's disability onset date.  For the reasons stated below, Plaintiff's second contention requires remand.

*Treating Physician*

Plaintiff challenges the ALJ's treatment of two of his treating physicians – Dr. Fajobi and Dr. Schaefer.  Respondent contends the ALJ gave good reasons for discounting both.  The Court will address Dr. Fajobi's opinion in this section, and Dr. Schaefer's opinion in conjunction with Plaintiff's objection to the disability onset date determination.

An ALJ must weigh medical opinions in the record based on certain factors. 20 C.F.R. § 404.927(d). In determining how much weight to afford a particular opinion, an ALJ must consider: are: 1) examining relationship; 2) treatment relationship – length, frequency, nature and extent; 3) supportability; 4) consistency; and 5) specialization. *Id.*; *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010).

13

Generally, the medical opinions of treating physicians are accorded greater deference than non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). A treating physician's opinion is given "controlling weight" if supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record." *Id.*  The ALJ must give "good reasons" for the weight it gives a treating physician's opinion. *Id.*  Failure to do so requires remand.  *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409-10 (6th Cir. 2009).

The ALJ gave the August 2006 and November 2007 opinions of Plaintiff's treating psychiatrist – Dr. Fajobi – "no probative weight".  (Tr. 33).  He explained Dr. Fajobi's opinions were: 1) on the ultimate issue of disability reserved to the Commissioner; 2) seemingly based on Plaintiff's "own symptoms and limitations"; 3) "not supported by the objective evidence independently provided by Dr. Fajobi"; and 3) not supported by other evidence in the record.  (*Id.*).

*Issues Reserved to Commissioner*

To the extent Dr. Fajobi opined Plaintiff was disabled and unable to work, the ALJ was correct to note that he is not required to defer to this conclusion on the ultimate issue of disability.

14

*See* 20 C.F.R. §§ 404.1527(e)(1); 416.927(e)(1). Thus, the ALJ was not required to defer to Dr. Fajobi's conclusion that Plaintiff was "[u]nemployable." (Tr. 206).[3]

    *Based on Subjective Symptoms*

    The ALJ found Dr. Fajobi's opinion "based on a recitation of [Plaintiff's] own symptoms" and "not supported by the objective evidence independently provided by Dr. Fajobi." (Tr. 33). Citing *Winning v. Comm'r of Soc. Sec.*, 661 F. Supp. 2d 807, 821 (N.D. Ohio 2009), Plaintiff contends this is not a good reason because psychiatry is inherently dependent on subjective symptoms. The undersigned agrees with the Court's statement in *Winning* that it is "illogical" to discount a treating psychiatrist's opinion solely because it is based on a plaintiff's subjective report of symptoms. *Id.* However, here the ALJ explained: Dr. Fajobi repeatedly noted Plaintiff "'reported difficulty' with his attention and concentration as well as his recent and remote memory. However, there is no evidence of actual testing in these areas performed by Dr. Fajobi on those occasions." (Tr. 29). This is accurate. Although Dr. Fajobi performed some concentration testing at his initial visit with Plaintiff – "Could not do serial[] 7[s] but did serial 3's, spel[led] WORLD backwards but slowly" (Tr. 221) – his later notes simply state: "Client reports difficulty." (Tr. 211, 213, 240, 253, 254, 278). Dr. Fajobi's records have no evidence of objective testing of Plaintiff's memory, though his initial notes indicate Plaintiff had "good remote" memory. Additionally, Dr. Fabjobi's opinion stated Plaintiff's limitations existed since at least 2003, citing on Plaintiff's own statement about the start of his symptoms as evidence. (Tr. 275). Dr. Fajobi did not begin treating Plaintiff until

_____

[3] Plaintiff contends the ALJ discounted *all* of Dr. Fajobi's opinions because he found they were on issues reserved to the Commissioner. The ALJ's wording was inartful – he summarized Dr. Fajobi's opinions and then stated: "However, these are opinions on an issue . . . that has ultimately been reserved to the Commissioner." (Tr. 33). However, he then listed three other reasons for discounting Dr. Fajobi's opinions.

November 2005. Thus, the ALJ's finding that Dr. Fajobi's opinions were based on Plaintiff's subjective complaints – in conjunction with the other reasons given – was reasonable and a good reason for discounting his opinion.

*Internal Consistency*

Plaintiff argues Dr. Fajobi "consistently noted [Plaintiff's] isolating tendencies, depressed moods, poor memory, and physical pain". (Doc. 16, at 13 (citing Tr. 210-24, 240-41, 278)). Defendant responds that Dr. Fajobi's treatment notes, particularly those closer in time to his opinions about Plaintiff's work capabilities, do not support the limitations to which he opined. Again, as noted above, Dr. Fajobi's notes regarding memory and concentration were not supported by objective evidence. And, as the ALJ noted: "The more recent notes provided by Dr. Fajobi indicate that [Plaintiff] has had good results from his treatment." (Tr. 32). This is correct; several notes indicate improvement. *See* Tr. 216 (February 2006: "feels energy has improved"); Tr. 211 (October 2006: "he feels his energy increased", "not loosing [sic] things, doing better with keeping appointments"); Tr. 254 (December 2006: "Tolerating wellbutrin, mood has improved, still with difficulties with memory. Sleep improving with trazodone prn."; "[F]eels he is socializing with more people."); Tr. 253 (February 2007: "Tolerating wellbutrin, mood has improved, still with difficulties with memory. Feels more rested with trazodone."; "States he is doing a bit more with his children."); Tr. 278 (October 2007: "Reports an improvement in insomnia, and irritability. Still with poor concentration and poor memory, otherwise denies other depressive symptoms. Feels his mood has improved since restarting his medications."). Therefore, although Dr. Fajobi noted Plaintiff's symptoms consistently, his notes do not support his conclusions that Plaintiff was as extremely limited as his opinions stated.

16

*Consistency with Record*

Plaintiff contends the other record evidence – including Dr. Felker's opinion and Nurse Root's treatment notes – is consistent with Dr. Fajobi's opinion. Defendant contends Nurse Root was not an "acceptable medical source" and Dr. Felker's opinion was consistent with the ALJ's RFC determination.  Dr. Fajobi, Dr. Felker, reviewing consultant Kevin Goeke, and Nurse Root are the only sources in the record to opine on Plaintiff's limitations from his mental impairments.  The ALJ implicitly credited Dr. Felker's opinion (Tr. 33 ("[T]he overall tone of her opinion is consistent with the mental non-exertional limitations described by the undersigned[.]")), and explicitly rejected Dr. Fajobi's opinion (*id.*).

First, although Nurse Root is not an "acceptable medical source" under 20 C.F.R. §§ 404.1513(a), 416.913(a), the ALJ was still required to weigh her opinion under SSR 06-03p, 2006 WL 2329939. However, as Defendant correctly points out, Nurse Root's "opinion" consisted of checking boxes to indicate Plaintiff's functional limitations would last twelve months or more and Plaintiff was unemployable. (Tr. 202).  Such a conclusory opinion is not entitled to great weight. *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 287 (6th Cir. 1994). The ALJ also discussed the evidence of Plaintiff's treatment at Murtis Taylor, including that by Nurse Root.  (Tr. 26, 28). He explained: "[T]he Murtis Taylor records noted in August 2005 that [Plaintiff] had friends and a girlfriend.  He was described as cooperative and he maintained 'OK' or good eye contact during his various visits at this facility."  (Tr. 28).  Thus, the ALJ reasonably concluded that Nurse Root's notes were not consistent with the extreme limitations imposed by Dr. Fajobi.

Second, although Plaintiff argues Dr. Felker's opinion supports Dr. Fajobi's opinion, Dr. Felker's opinion assessed milder restrictions.  For example, Dr. Fajobi noted Plaintiff was markedly

17

or extremely limited in his ability to concentrate (Tr. 205), whereas Dr. Felker found Plaintiff was only mildly to moderately limited.  (Tr. 182).  Similarly, Dr. Fajobi found Plaintiff was markedly limited in his ability to interact appropriately with the general public (Tr. 205), whereas Dr. Felker found Plaintiff only mildly to moderately limited.  (Tr. 182).  Dr. Fajobi and Dr. Felker essentially agreed on Plaintiff's symptoms, but disagreed as to the *degree* of limitation on his ability to work.

The Court notes that although the ALJ rejected Dr. Fajobi's opinions about the degree of limitation Plaintiff would have in working, he did consider and discuss Dr. Fajobi's treatment notes in formulating his RFC.  (Tr. 28-29, 32-33).  That RFC included mental limitations: "simple, routine and low stress tasks requiring only limited and superficial interaction with supervisors, coworkers and the public" and no "tasks [with] strict time requirements and high production quotas."  (Tr. 30).  Finally, the ALJ also considered the record as a whole – including Plaintiff's self-reported daily activities (Tr. 28) and overall conservative mental health treatment record (Tr. 32).  Thus, the Court concludes the ALJ gave "good reasons" for giving Dr. Fajobi's opinions "no probative weight."

*Disability Onset Date*

Plaintiff argues the ALJ did not explain why he did not credit Dr. Schaefer's opinion that Plaintiff's physical limitations began earlier than February 2006. The onset date in this case is particularly important because Plaintiff's date last insured was June 30, 2005.  Because the ALJ determined Plaintiff's onset date was after that date, Plaintiff was only entitled to SSI benefits, not DIB.  *See Moon v. Sullivan*, 293 F.2d 1175, 1182 (6th Cir. 1994) (to obtain DIB, plaintiff must be disabled before his date last insured).

With regard to disability onset, the Plaintiff must prove he became disabled prior to the date selected by the Commissioner; the Commissioner is not required to disprove any earlier onset date,

18

so long as the Commissioner's determination is supported by substantial evidence. *Blankenship v. Sec'y of Health &Human Servs*, 874 F.2d 1116, 1121 (6th Cir. 1989).

SSR 83-20, 1983 WL 31249, *1, provides: "Factors relevant to the determination of disability onset include the individual's allegation, the work history, and the medical evidence." "The medical evidence serves as the primary element in the onset determination." *Id.* at *2. "[T]he onset date should be set on the date when it is most reasonable to conclude from the evidence that the impairment was sufficiently severe to prevent the individual from engaging in SGA (or gainful activity) for a continuous period of at least 12 months or result in death. Convincing rationale must be given for the date selected." *Id.* at *3.

The ruling continues:

In some cases, it may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination, e.g., the date the claimant stopped working. How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case. This judgment, however, must have a legitimate medical basis. At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred.

*Id.* An ALJ is not required to call on a medical expert to infer the onset of disability if the "medical record [is] well developed and carefully reviewed by the ALJ." *McClanahan*, 474 F.3d at 836-37. As the *McClanahan* court noted: "The portion of the ruling that [plaintiff] relies on contemplates situations where an individual claims disability and there is no development of the medical record on which the ALJ can rely to ascertain onset." *Id.* at 837.

Unlike *McClanahan*, here the ALJ here did not provide a "[c]onvincing rationale" for the date selected based on "a legitimate medical basis" because there was no medical evidence of Plaintiff's condition during the relevant time period. SSR 83-20, 1983 WL 31249, *3. With respect

19

to Plaintiff's physical impairments, the ALJ explained why he declined to adopt an earlier onset
date:

> In terms of his physical impairments before February 1, 2006, the record indicates
> that he was primarily followed as an outpatient for his various pain complaints.  The
> notes of his treatment indicate that he was conservatively treated, including
> medications of Ibuprofen and Naproxen.  These records show that [Plaintiff] was
> seen at regular intervals without the need for frequent unscheduled interventions due
> to the underlying nature of his pain or because of acute exacerbations. Moreover,
> there is no evidence that [Plaintiff] required emergency room treatments or periods
> of hospitalization prior to February 1, 2006.  There is also no evidence that [Plaintiff]
> received extended courses of physical therapy, occupational therapy, admissions to
> work hardening and/or pain management programs and other forms of restorative
> medicine prior to February 1, 2006.  Likewise, there is no evidence that he was
> provided with a TENS unit, mandatory ambulatory support, low back brace and/or
> other special joint braces, or other forms of alternative pain management prior to
> February 1, 2006.

(Tr. 32).  He noted after February 1, 2006, Plaintiff had more objective clinical findings supporting

his claims of physical impairments, (Tr. 34), and Plaintiff began getting regular treatment. (Tr. 32-

34).  This is true, however, there is a substantial gap in the record – from February 2005 to February

2006 – during which there is no evidence of Plaintiff's physical condition.

Although the ALJ is correct that Plaintiff had more severe objective findings in February

2006, including decreased ranges of motion in the lumbar spine and right shoulder, plantar fasciitis

findings, and an antalgic gait, he did not offer any explanation for why he believed these conditions

became disabling two weeks before the examination.  (Tr. 34).  Plaintiff had provided evidence that

some of these conditions began prior to February 1, 2006.  (*See, e.g.*, Tr. 162, 164, 177).

To support his claim of an earlier onset date, Plaintiff points out Dr. Schaefer filled out a

residual functional capacity questionnaire with the phrase "Condition Prior to June 2005 and

Continuing" pre-printed at the top.  (Tr. 226).  The ALJ notes this and explains that Dr. Schaefer's

assessments are "persuasive and probative only to the extent that [Plaintiff] has been precluded from

20

performing more than the exertional requirements of sedentary work since February 2006 when he first began to see Dr. Schaefer."  (Tr. 34).  Although Defendant is correct that the ALJ may reasonably reject non-contemporaneous physician reports in favor of contemporaneous objective evidence, *Coleman v. Sec'y of Health & Human Servs.*, 1995 WL 64712 (6th Cir.), the ALJ here rejected Dr. Schaefer's opinion *without* objective evidence in the record to support the onset date.

Given the substantial gap in the medical record, this is a case where "there is no development of the medical record on which the ALJ can rely to ascertain onset." *McClanahan*, 474 F.3d at 837. Because Plaintiff's date last insured fell within that year-long gap, if the ALJ wished to reject Dr. Schaefer's opinion, he should have called a medical advisor to determine Plaintiff's onset date.

### Conclusion and Recommendation

Following review of the arguments presented, the record, and applicable law, this Court finds the Commissioner's decision regarding Plaintiff's disability onset date not supported by substantial evidence.  The undersigned therefore recommends the Commissioner's decision be reversed and remanded for proper determination of Plaintiff's disability onset date.

s/James R. Knepp II
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).